UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

INTERNATIONAL ALLIANCE OF          *
THEATRICAL STAGE EMPLOYEES,        *
MOVING PICTURE TECHNICIANS,        *
ARTISTS AND ALLIED CRAFTS,         *
LOCAL 11,                          *
                                   *
            Plaintiff,             *
                                   *        Civil Action No. 1:19-cv-12579-IT
v.                                 *
                                   *
MARTIN SPORTS & ENTERTAINMENT, *
LLC,                               *
                                   *
            Defendant.             *
                                   *

MEMORANDUM & ORDER

March 22, 2023

TALWANI, D.J.

        In this action, Plaintiff International Alliance of Theatrical Stage Employees, Moving

Picture Technicians, Artists and Allied Crafts ("IATSE"), Local No. 11 ("IATSE Local 11" or

"Local 11") claims that Defendant Martin Sports & Entertainment, LLC ("Martin Sports")

breached a collective bargaining agreement entered into pursuant to Section 301(a) of the Labor

Management Relations Act ("LMRA"), 29 U.S.C. § 185(a).

        For the reasons that follow, Martin Sports's Motion for Summary Judgment [Doc. No.

46] is GRANTED in part and DENIED in part.

I.      **Background**[1]

A. *The Parties*

Local 11 is a labor union that has collective bargaining agreements covering work in a number of venues, and also enters into collective bargaining agreements pursuant to which stagehands are referred to work for presenter employers that do not have a regular presence within the jurisdiction of Local 11. Aff. of Colleen A. Glynn in Supp. of Pl.'s Mot. for Summ. J. ("Glynn Aff.") ¶ 2 [Doc. No. 48-1].

Colleen Glynn is the Business Manager of Local 11 responsible for oversight of the day-to-day operation of Local 11, including the operation of the Local 11 hiring hall from which stagehands who perform work covered by Local 11 collective bargaining agreements are referred. Id. at ¶ 1. Glynn and Christopher Welling (collectively, the "Trustee Plaintiffs") are trustees and fiduciaries of the ERISA employee benefit plans sponsored by Local 11 ("ERISA Plans"). Statement of Undisputed Material Facts ("SOMF"), Defs.' Brief in Supp. of Mot. for Summ. J. ("Defs.' Brief in Supp.") 1, 19-cv-12189 [#54-1].[2]

---

[1] In the related action, Glynn, et al. v. Martin Sports & Entertainment, LLC, et al., 19-cv-12189, Plaintiffs Colleen Glynn and Christopher Welling, in their capacity as Trustees and Fiduciaries of certain Local 11 employee benefit plans, bring a claim against Martin Sports alleging delinquent contributions under Sections 502(a)(3) and 515 of the Employee Retirement Income Security Act of 1974 ("ERISA"), and Plaintiff Douglas Anderson, on his own behalf and on behalf of others similarly situated, brings a claim against Martin Sports, David Martin, and Theresa Martin for failure to pay wages pursuant to Mass. Gen. Laws ch. 149, §148. The court consolidated the matters for purposes of summary judgment briefing, See Elec. Order [Doc. No. 45], and provides here the background relevant to both cases.

[2] Per Local Rule 56.1, the court finds the "material facts of record set forth in the statement required to be served by the moving party . . . to be admitted by opposing parties unless controverted by the statement required to be served by opposing parties."

Martin Sports is a Michigan limited liability corporation engaged in the sports promotion business, conducting promotion events for various professional sports teams at locations around the county. Jan. 29, 2020 Decl. of David Martin ¶ 2 ("First David Martin Decl.") [Doc. No. 46-6]. David Martin is the sole member and owner of Martin Sports and its President and CEO. Id. at ¶ 1. In 2019, Theresa Martin did not have an official position with Martin Sports, see Deposition of Theresa Martin ("Theresa Martin Dep.") Tr. 08:05–08, 11:23–12:02 [Doc. No. 46-8], but she held herself out as Vice President of Martin Sports, see Theresa Martin Dep. Tr. 12:08–12 [Doc. No. 46-8], and, at times, David Martin directed her to make or arrange payment, or notify third-parties regarding payment processing, see Theresa Martin Dep. Tr. 30:12–19 [Doc. No. 46-8].

Martin Sports hires stagehands and other workers for installation and removal of stages and other equipment used for its sports promotion events. First David Martin Decl. ¶ 5 [Doc. No. 46-6]. The stagehands are recruited by Martin Sports through help wanted advertisements or are referred to it by various IATSE local unions around the county with which Martin Sports has established a referral relationship. Id.

Christopher Anderson is a Local 11 member. SOMF, Defs.' Brief in Supp. 1–2, 19-cv-12189 [#54-1]. Martin Sports received an invoice reflecting that Anderson completed work for Martin Sports on May 12, 2019. First David Martin Decl. ¶ 14 [Doc. No. 46-6]; American Residuals & Talent, Inc. Payroll Records [Doc. No. 46-5]; March 20, 2019 Invoice, 19-cv-12189 [#55-2].

B.  *The 2018 Correspondence, Agreements and Event*

    1.  Martin Sports's 2018 Payroll Agreement with American Residuals & Talent, Inc. ("ART")

On August 17, 2018, Martin Sports entered into a payroll agreement with ART. Ex. B, Talent Payroll Support Agreement [Doc. No. 46-3]. By the terms of the agreement, ART would provide payroll services for personnel hired by Martin Sports for various productions, including those hired under collective bargaining agreements. Id. ART acted as the "employer of record" for purposes of federal and state taxes, unemployment taxes, and workers compensation insurance, and was responsible for: (A) processing payroll data timely delivered to it by Martin Sports and preparing invoices reflecting the payments to be made according to the information provided by Martin Sports, any applicable collective bargaining agreement and/or personal services contracts, and the requirements of applicable law; (B) ensuring that all Martin Sports-approved talent payments will be made to the personnel as invoiced, including all the appropriate tax withholdings, and person and health contributions, and making payments to personnel upon receipt of payment by Martin Sports; (C) preparing invoices for payroll data accurately completed and timely delivered by Martin Sports in accordance with the schedule dictated by specific collective bargaining agreements. Id. at § 2. ART Responsibilities.

Pursuant to the agreement, Martin Sports "agree[d] to pay ART: (a) the actual wages due to the Personnel, (b) the applicable Union Pension & Health fees, (c) a fee of 20% of the Personnel wages representing employer's payroll taxes, and (d) a handling fee of 8% of the Personnel wages." Id. at § 3.1 ART Compensation and Payment. The agreement provided that "[i]n the event that [Martin Sports] fail[ed] to pay undisputed invoices within the frame dictated by federal and state labor laws, the applicable collective bargaining agreement and/or personal

4

service contract, [Martin Sports] agrees to indemnify and hold harmless ART for any penalties, fines, settlements, damages, awards or judgments incurred by, levied upon or awarded against ART for late payment of wags, if such late payment resulted from [Martin Sports's] failure to provide accurate payroll data or pay invoices timely delivered by ART to [Martin Sports]." Id. at § 3.2. The agreement further provided that Martin Sports "must notify ART within twenty four (24) hours of receipt of the invoice if [Martin Sports] disputes any item on the invoice" and that Martin Sports and ART "agree to work to resolve any disputed items in a prompt manner." Id. at § 3.3.

### 2.   Martin Sports's 2018 Agreement with Local 11

On August 19, 2018, after Martin Sports had entered into the payroll agreement with ART, Theresa Martin contacted Glynn to obtain referrals from Local 11 for stagehands to work constructing and dismantling a stage for a Martin Sports's event several days later. Ex. 1, August 19, 2018 email exchange [Doc. No. 48-1]. The same day, Glynn responded, in part, that she would "put together our standard contract shortly." Id. The following day, Glynn sent Theresa Martin a document entitled "Agreement between IATSE Local 11 and Martin Sports[,] August, 2018." Ex. 1, August 20, 2018 email exchange [Doc. No. 48-1]. In the cover email, Glynn referred to the document as Local 11's "standard 'one time agreement,'" id., although, in many instances, such agreements apply to multiple performances by the presenter, Glynn Aff. ¶ 2 [Doc. No. 48-1]. Glynn also included the contact information for ART in case Martin Sports wanted to use a local payroll company. Ex. 1, August 20, 2018 email exchange [Doc. No. 48-1].

The proposed agreement in part provided for a daily minimum of eight consecutive hours of work by the individuals referred by Local 11. Ex. 1, Proposed August 2018 Agreement, § 4. Conditions [Doc. No. 48-1]. It also set out wage rates, trust fund contributions, and other terms

5

and conditions of employment, and included a related trust agreement for ERISA employee benefit plans sponsored by Local 11. Id. at § 2018 Agreement Addendum, § Trust Acceptance Agreement.

On August 23, 2018, upon Theresa Martin's request, Glynn provided a revised agreement, which included a daily minimum of four consecutive hours of work. Ex. 1, August 23, 2018 email exchange [Doc. No. 48-1]; Glynn Aff. ¶ 3 [Doc. No. 48-1]; Revised August 2018 Agreement, § 4. Conditions [Doc. No. 46-2]. Theresa Martin returned the revised agreement and related trust agreement with an electronic signature by David Martin. August 23, 2018 email exchange [Doc. No. 48-1]; Glynn Aff. ¶ 3 [Doc. No. 48-1].

Pursuant to the signed agreement, Local 11 would "present a consolidated bill to the producing company who may choose to use a payroll company[;] if no payroll company is chosen payment should be made to each individual employee. Local #11 will distribute such payment if so desired but persons employed are not employees of the Local. If requested, Local #11 will provide social security numbers and/or W-4 forms on the job. . . . Payment must be received no later than 10 days from receipt of final invoice. Delinquent payments subject to a fee based on 1.5% of total gross wages per each day of delinquency." Ex. A, August 2018 Agreement Addendum, § Method of Payment [Doc. No. 46-2]. For the trust agreement between Martin Sports and the ERISA employee benefit plans sponsored by Local 11, ART was designated as the payroll company. Id. at § Trust Acceptance Agreement. The term of the trust agreement was August 2018. Id.

      3.   Martin Sports's August 2018 Event

Local 11 referred stagehands for Martin Sports's August 24, 2018 event. Glynn Aff. ¶ 4 [Doc. No. 48-1]. Per the executed contract between ART and Martin Sports, ART invoiced

Martin Sports for the cost of the labor, Martin Sports paid the invoices, and ART in turn paid the employees referred by Local 11 and the respective employee benefit plans. Id.

    C.  *The 2019 Correspondence, Agreements and Events*

        1.  2019 Agreement Between Martin Sports and Local 11

On May 8, 2019, Theresa Martin contacted Glynn and requested that Local 11 refer a crew of stagehands to Martin Sports to work an 8-hour shift the next morning installing a Bruins Fan Fest event stage. Ex. 2, May 8, 2019 email exchange [Doc. No. 48-1]. That afternoon, Glynn responded to Theresa Martin by providing a contract, which Glynn again referred to as a "standard one[-]time agreement," for the next day's event. Id. The contract was titled "Agreement Between IATSE Local 11 and Martin Sports 2019" ("2019 Agreement") and included a related trust agreement. Ex. A, 2019 Agreement [Doc. No 46-2].

Theresa Martin signed the 2019 Agreement on behalf of Martin Sports. Id. Theresa Martin also signed the related trust agreement between Martin Sports and the ERISA employee benefit plans sponsored by Local 11 as "V.P." of Martin Sports. Id. at § Trust Acceptance Agreement. In the related trust agreement, Theresa Martin designated ART as the payroll company. Id.

The 2019 Agreement states, in relevant part, that it shall:

> cover, apply to, and include, all work done by [Martin Sports] at facilities within the territorial jurisdiction of [Local 11] in the installing, assembling, erecting, application, dismantling, maintenance, repair, handling, placement, or operation of all electronic, portable electrical and sound equipment devices, slide projection, laser equipment, liquid project, and all other types of theatrical effects, apparatus and effects and all scenery, drops, travelers, trusses, scaffolding, steel work, properties, decorations, displays or other staging or theatrical accessories and effects and description for use in the production. All such work shall be done only by employees of [Martin Sports] under the jurisdiction of [Local 11].

Id. at § 2. Scope and Jurisdiction.

The 2019 Agreement further states, in relevant part, that:

> [w]hen the need arises for work to be performed that falls within [Local 11's] jurisdiction as provided by this Agreement, [Martin Sports] will notify [Local 11] as soon as possible of the number of employees needed to work. [Local 11] shall refer competent employees to fill the call and shall give [Martin Sports] notice as early as possible if it is unable to fill the call. [Martin Sports] shall then have the right to hire employee from any source, including individuals not represented by [Local 11] to perform whatever work [Local 11] is unable to perform.

Id. at § 3. Hiring.

According to the 2019 Agreement, the conditions with respect to covered employees are, in relevant part, as follows:

> [t]he minimum daily work call shall be no less than eight (8) consecutive hours.
>
> . . . .
>
> "Base rate" rate = straight time rate.
>
> . . . . Any work performed after eight (8) hours in a day, or after forty (40) straight time hours worked, will be paid at the rate of one and one-half times the base rate.
>
> SATURDAY CLAUSE: Work performed after 5:00 p.m. will be paid at one and one-half times the base rate.
>
> SUNDAY & HOLIDAY CLAUSE: All work performed will be paid at one and one-half times the applicable hourly rate.
>
> . . . .
>
> If workers are laid off and called back before a rest period of eight (8) hours has elapsed, two (2) times the base rate will be paid until a rest period of eight (8) hours is called.
>
> FRACTIONS OF AN HOUR: Fractions of an hour shall constitute one (1) hour. However, when working on the hourly rate, the call may begin on the half-hour or on the hour and must end on the corresponding half-hour or hour.
>
> HOLIDAYS: The following days (as determined by the Massachusetts Legislature) shall be recognized under this agreement as legal holidays, and work performed on those days shall be paid as per local contract: New Year's Day, Presidents' Day, Patriots' Day, Memorial Day, Independence Day, Labor Day, Columbus Day, Thanksgiving, Christmas, Veterans' Day.

Id. at § 4. Conditions (numbering omitted). The 2019 Agreement further provides that "[a] one hour meal must be given no less than three (3) hours nor more than five (5) hours from the

original call of the day, or the last meal period." Id. at § 5, Meals. If "no meal is granted, the employees shall be paid one (1) hour at the base rate and one (1) hour at the prevailing rate for each hour worked until a meal period is given or a meal is provided." Id. However, "[i]n lieu of a one (1) hour meal break, the employer may provide a substantial meal, in which case the employees will suffer no loss of time on the payroll." Id. "If the employees are broken for one (1) hour for the second meal of the day, they shall receive a three (3) hour minimum call when they return to work." Id.

The addendum to the 2019 Agreement contained identical method of payment language as the 2018 August agreement. Compare Ex A., August 2018 Agreement Addendum, § Method of Payment [Doc. No. 46-2] with 2019 Agreement Addendum, § Method of Payment [Doc. No. 46-2].

In the related trust agreement between Martin Sports and the ERISA Plans sponsored by Local 11, ART was again designated as the payroll company. Ex. A, 2019 Agreement, § Trust Acceptance Agreement [Doc. No. 46-2]. In the trust agreement, the term of the agreement was left blank. Id.

2.   May 9 and 12, 2019 Bruins Fan Fests

As requested by Martin Sports, Local 11 referred stagehands to Martin Sports to work on the morning of May 9, 2019 to produce the Bruins Fan Fest event that day. Glynn Aff. ¶ 8 [Doc. No. 48-1].

On May 9, 2019, Theresa Martin sent an email to Glynn requesting a different 6-person crew to work a 4-hour shift that night at 10:30 p.m. to remove the Fan Fest stage. May 9, 2019 email exchange, Ex. 3, May 10, 2019 email exchange [Doc. No. 48-1]. In response, Local 11

referred another crew to remove the Bruins Fan Fest stage that night. See Ex. 3, May 10, 2019

email exchange [Doc. No. 48-1].

On May 10, 2019, Theresa Martin sent another email to Glynn requesting that Local 11

refer a 10-person crew on May 12, 2019, beginning at 8 a.m. for another Bruins Fan Fest stage

installation to be completed by 1 p.m. and a different 10-person crew of 10 beginning at 6 p.m.

that evening to dismantle. Id. Theresa Martin noted that Martin Sports could not afford overtime

hour charges and requested that Glynn let her know if she was "entering that scenario." Id. Local

11 referred stagehands to Martin Sports for the May 12, 2019 work. Glynn Aff. ¶ 8 [Doc. No.

48-1].

On May 20, 2019, ART sent Martin Sports an invoice for $24,581.86 for the work

performed by the Local 11-referred crews on May 9 and 12, 2019. First David Martin Decl. ¶ 14

[Doc. No. 46-6].

      3.   May 27 and 29, 2019 Bruins Fan Fests

On May 25, 2019, Theresa Martin contacted Glynn again requesting Local 11 refer a

crew of 6 stagehands and 1 forklift driver for a 5-hour shift on May 27, 2019, beginning at 7 a.m.

for Fan Fest stage installation and a crew of 6 stagehands and 1 forklift driver on May 27, 2019,

at 8 p.m. for a 4-hour shift for Fan Fest stage removal. Ex. 5, May 25, 2019 email exchange

[Doc. No. 48-1]. Theresa Martin advised Glynn that Martin Sports's budget for these services

was limited to $5,000 and requested confirmation that Glynn could "work within the budget." Id.

On May 26, 2019, Glynn responded to Theresa Martin that with a reduction in the minimum

hours and the benefits package the attached adjusted estimate was "just over $5K." Ex. 5, May

26, 2019 email exchange [Doc. No. 48-1].

On May 28, 2019, Theresa Martin contacted Glynn to change the minimum call from 8 hours to 4 hours and wave the 8-hour period between calls for the May 29, 2019 event. Ex. 4, May 28, 2019 email exchange [Doc. No. 48-1]. Specifically, in the email Theresa Martin requested Local 11 to refer and provide an estimate for a crew of 6 stagehands and 1 forklift driver on May 29, 2019, at 8 a.m. for a 5-hour shift stage installation and a crew of 6 stagehands and 1 fork lift driver beginning that day at 8 p.m. for a 4-hour removal. Id. Later that day, Glynn sent Theresa Martin an email stating that Local 11 would waive the 8-hour turn around and invoice removal as 4 hours at time and one half. Id. Glynn again also emailed Theresa Martin an estimate of the cost of the labor for the May 29, 2019 event. Id.

On May 29, 2019, Theresa Martin emailed Glynn communicating that Martin Sports does not have "the budget to pay for 8 hour minimum call times & time & a half," and that when Martin Sports ended the Local 11-referred workers' morning shift at 1 p.m., the Local-11 referred stagehands on site informed Martin Sports that they were working 8 hours for the first shift and 4 hours for the second. Ex. 6, May 29, 2019 email exchange [Doc. No. 48-1]. Glynn did not respond to this email. See Ex. 6, June 4, 2019 email exchange [Doc. No. 48-1] ("Colleen, I have not heard from you regarding issues raised.").

On June 4, 2019, ART sent Martin Sports an invoice for Local 11 member wages in the amount of $10,794.09 for the May 27 and 29, 2019 Fan Fest stage installations and removals. First David Martin Decl. ¶ 17 [Doc. No. 46-6].

### 4. Martin Sports's Rejection of Contract Obligations

Martin Sports never paid the ART invoices for any of the May work, Glynn Aff. ¶ 15 [Doc. No. 48-1], and on June 4, 2019, Theresa Martin emailed Glynn stating that Martin Sports was terminating the "standard one[-]time agreement" sent by Glynn to Theresa Martin on May 8,

2019. Ex. 6, June 4, 2019 email exchange [Doc. No. 48-1]. On June 5, 2019, Glynn responded

that it is "Local 11's position that our contract is not subject to being unilaterally terminated."

Ex. 6, June 5, 2019 email exchange [Doc. No. 48-1].

     5.    June 6 and 12, 2019 Bruins Fan Fests

Martin Sports produced the Bruins Fan Fests for the next two playoff games on June 6

and 12, 2019. Am. Answer to Compl. ¶ 9 [Doc. No. 53]. Martin Sports did not ask Local 11 to

refer stagehands for these productions. <u>See</u> Dep. of Colleen Glynn ("Glynn Dep.") Tr. 91:03–07

[Doc. No. 46-4].

     6.    Payments Made to ART

On June 14, 2019, after Martin Sports had failed to pay the ART invoice for work

performed by Local 11-referred employees on May 9 and 12, 2019, Local 11 paid ART

$24,188.06 so that ART could issue checks to the Local 11-referred employees who worked for

Martin Sports on those dates. Aff. of Colleen A. Glynn in Supp. of Pls.' Opp'n to Defs.' Mot. for

Summ. J. ("Second Glynn Aff.") ¶ 3, 19-cv-12189 [#58-1].

On June 21, 2019, after Martin Sports failed to pay the second ART invoice for work

performed by Local 11-referred employees on May 27 and 29, 2019, Local 11 paid ART

$10,621.09. <u>Id.</u> at ¶ 4.

     7.    October 12 and 14, 2019 Bruins Fan Fests

On October 12 and 14, 2019, Martin Sports produced the Bruins Fan Fests for the first

two homes games of the 2019-2020 season. Am. Answer to Compl. ¶ 9 [Doc. No. 53]. Martin

Sports did not ask Local 11 to refer stagehands for these productions. <u>See</u> Glynn Dep. Tr. 92:24–

25 [Doc. No. 46-4].

## II.      Legal Standard

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material when, under the governing substantive law, it could affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Baker v. St. Paul Travelers, Inc., 670 F.3d 119, 125 (1st Cir. 2012). A dispute is genuine if a reasonable jury could return a verdict for the non-moving party. Anderson, 477 U.S. at 248.

The moving party bears the initial burden of establishing the absence of a genuine dispute of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). This burden can be satisfied in two ways: (1) by submitting affirmative evidence that negates an essential element of the non-moving party's claim or (2) by demonstrating that the non-moving party failed to establish an essential element of its claim. Id. at 331.

Once the moving party establishes the absence of a genuine dispute of material fact, the burden shifts to the non-moving party to set forth facts demonstrating that a genuine dispute of material fact remains. Id. at 314.  The non-moving party cannot oppose a properly supported summary judgment motion by "rest[ing] on mere allegations or denials of [the] pleadings." Anderson, 477 U.S. at 256. Rather, the non-moving party must "go beyond the pleadings and by [his or] her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Celotex, 477 U.S. at 324 (internal quotation marks omitted). Disputes over facts "that are irrelevant or unnecessary" will not preclude summary judgment. Anderson, 477 U.S. at 248.

13

When reviewing a motion for summary judgment, the court must take all properly supported evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990). "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment[.]" Anderson, 477 U.S. at 255.

**III.   Discussion**

Local 11 claims that Martin Sports violated § 301(a) of the LMRA by failing to hire Local 11-referred employees to perform work covered by the 2019 Agreement for the Bruins Fan Fests produced on June 6 and 12, and October 12 and 14, 2019. Martin Sports moves for summary judgment.

A.  *June 6 and 12, 2019 Boston Bruins Fan Fest Events*

1.   Statute of Limitations

Martin Sports contends that Local 11's claims related to the June 6 and 12, 2019 Boston Bruins Fan Fest events are time barred under § 10(b) of the National Labor Relations Act ("NLRA"), see Def.'s Mem. in Supp. of Summ. J. ("Def.'s Mem. in Supp.") 15 [Doc. No. 46-1], where these events occurred more than six months before Local 11 filed the Complaint [Doc. No. 1] on December 24, 2019. Local 11 contends that its § 301 claim against Martin Sports for breach of the agreement is governed by Massachusetts's six-year statute of limitations for breach of contract under M.G.L. c. 260, § 2. Pl.'s Opp'n to Def.'s Mot. for Summ. J. ("Pl.'s Opp'n") 7–9 [Doc. No. 48].

In DelCostello v. Teamsters, 462 U.S. 151, 158–172 (1983), the Supreme Court held that the six-month statute of limitations under §10(b) of the NLRA applies where the "suit is [] not a

straightforward breach of contract suit under § 301 . . .  but a hybrid § 301/fair representation claim, amounting to a direct challenge to the private settlement of disputes under [the collective-bargaining agreement][,]" and has "no close analogy in ordinary state law." DelCostello, 462 U.S. at 165 (internal quotation marks and citation omitted).

The DelCostello Court contrasted such a hybrid claim with that in Auto Workers v. Hoosier Corp., 383 U.S. 696 (1966), which "was a straightforward suit under § 301 of the Labor Management Relations Act, 29 U.S.C. § 185, for breach of a collective bargaining agreement by an employer." Id. at 162. As the DelCostello Court noted, the suit in Hoosier "did not involve any agreement to submit disputes to arbitration, and the suit was brought by the union itself rather than by an individual employee." Id. Although, as the DelCostello Court put it, Hoosier "recognized that the subject matter of § 301 is peculiarly one that calls for uniform law," id. (internal quotation marks omitted), it "reasoned that national uniformity is of less importance when the case does not involve 'those consensual processes that federal labor law is chiefly designed to promote—the formation of the collective agreement and the private settlement of disputes under it,'" id. (quoting Hoosier, 383 U.S., at 701–02, 86 S.Ct., at 1110–11). Further, the DelCostello Court noted that Hoosier "relied heavily on the obvious and close analogy between this variety of § 301 suit and an ordinary breach of contract case" for purposes of determining the applicable statute of limitations. Id. As Local 11's § 301 claim is for a "straightforward" breach of the 2019 Agreement, the six-year statute of limitations for breach of contract under M.G.L., c. 260, § 2 applies.

Accordingly, Local 11's § 301 claims are not time barred under § 10(b) of the NLRA.

2.   Contract Duration and Termination

Martin Sports contends that the 2019 Agreement only applied to the May 9, 2019 event. Def.'s Mem. in Supp. 15–16 [Doc. No. 46-1]. Martin Sports asserts further that in any event the contract contained no contract term or termination provisions and was therefore terminable at will, and that Martin Sports terminated the 2019 agreement on June 4, 2019, with reasonable notice in advance of the June 6 and 12, 2019 Bruins Fan Fest events. Id.

Local 11 contends that the 2019 Agreement had a definite term—all of 2019—as indicated in the header of the document and consistent with Glynn's discussions with Theresa Martin. Pl.'s Opp'n 3, 9 [Doc. No. 48]. Local 11 contends further that even if the contract did not have a definite term, Martin Sports's termination two days and eight days in advance of the June 6 and 12, 2019 events, respectively, was not reasonable. Id. at 10. The court finds that summary judgment is precluded as to both grounds.

Here, the agreement is titled, "Agreement between IATSE Local 11 and Martin Sports 2019," but the "Term of Contract" provision is left blank. See Ex. A, 2019 Agreement [Doc. No. 46-2]. The court turns to evidence of prior or contemporaneous oral agreements to ascertain whether the parties agreed to a definite term for the agreement at issue.

Theresa Martin states that she contacted Glynn on May 8, 2019, for Local 11 to "refer a crew . . . to work . . . on May 9, 2019, to install a stage for a Bruins Fan Fest event." Declaration of Theresa Martin ("Theresa Martin Decl.") ¶ 7 [Doc. No. 46-7]; see also Ex. 2, May 8, 2019 email exchange [Doc. No. 48-1]. In her deposition, Theresa Martin states that she initiated "one phone call" with Glynn before executing the 2019 Agreement "to confirm that [Glynn] had staff available for the following day." Theresa Martin Dep. Tr. 34:12–34:24 [Doc. No. 46-8]. But Glynn "recall[ed] conversations with Theresa Martin about [how] the Bruins were in the playoffs

16

so [they] weren't sure how long the contract needed to be." Glynn Dep. Tr. 64:15–17 [Doc. No. 46-4]. According to Glynn, she "put the date range 2019 because it was an elimination Stanley Cup Finals. So because [Martin Sports and Glynn] didn't know whether this event was going to go one game series, two game series, to the final Stanley Cup series, the date range was 2019." Id. at 64:17–22.

Martin Sports contends that Glynn's May 8, 2019 email to Theresa Martin, which referenced "a contract for tomorrow[']s event," confirms that the 2019 Agreement pertained only to the May 9, 2019 event. Def.'s Mem. in Supp. 15 [Doc. No. 46-1]. But the email does not preclude the 2019 Agreement from also applying to subsequent Fan Fest events, if any occurred. Indeed, Theresa Martin subsequently emailed Glynn for Local 11-referred crews to assist Martin Sports with dismantling the Bruins Fan Fests on May 9, 2019, and to assist with the May 12, 27, and 29, 2019 Bruins Fan Fests without executing another agreement. Moreover, on June 4, 2019, Theresa Martin, emailed Glynn to "notify [her] that [Martin Sports] [is] terminating [its] contract dated May 8, 2019 with Local 11." Ex. 6, June 4, 2019 email exchange [Doc. No. 48-1]. This notification by Martin Sports is evidence that Martin Sports understood that the agreement was still operative in June 2019, otherwise there would be no need to terminate it.

Alternatively, even if the parties did not intend for the 2019 Agreement to cover the period through the Stanley Cup Final, then the title of the agreement and Glynn's Affidavit [Doc. No. 48-1] prevent the court from finding as matter of law that the agreement contains no expiration date and is indefinite rather than covering Martin Sport's 2019 production of the Bruins Fan Fest events.

Even if the 2019 Agreement contained no expiration date and was terminable at will, Martin Sports's alternative argument that it provided reasonable notice of termination to Local

11 prior to the June Fan Fests, <u>see</u> Def.'s Mem. in Supp. 16 [Doc. No. 46-1], fails. Martin Sports

was obligated to give written notice, sixty days prior to the date it proposed to terminate the

contract. <u>See</u> 29 U.S.C. § 158(d)(1) ("[N]o party . . . shall terminate or modify such contract,

unless the party desiring such termination or modification—(1) serves a written notice upon the

other party to the contract of the proposed termination or modification . . ., [] in the event such

contract contains no expiration date, sixty days prior to the time it is proposed to make such

termination or modification."). Accordingly, the several day notice would be unreasonable.

"[S]ummary judgment is appropriate only if 'the extrinsic evidence presented about the

parties' intended meaning is so one-sided that no reasonable person could decide to the

contrary.'" <u>Bank v. Int'l Bus. Machines Corp.</u>, 145 F.3d 420, 424 (1st Cir. 1998) (quoting <u>Den</u>

<u>Norske Bank AS v. First Nat. Bank of Bos.</u>, 75 F.3d 49, 53 (1st Cir. 1996)). As discussed above,

Martin Sports has not proffered any evidence to dispute that Glynn and Theresa Martin

understood that the agreement was not limited to May 9, 2019, or to show that the agreement

was for an indefinite duration.

Accordingly, considering all of the evidence put forth, the court finds that Martin Sports

is not entitled to summary judgment as to the claims relating to the June 6 and June 12, 2019 Fan

Fest events based on the contract term or Martin Sports's notice of termination.

3.  Damages

Martin Sports contends that Local 11 cannot prove contract damages where it has no

probative evidence of the specifics of how Martin Sports staffed the events and which Local 11-

referred workers were passed over as a result. Def.'s Mem. in Supp. 17 [Doc. No. 46-1]. Local

11 contends that the spoliation doctrine applies where Martin Sports had notice of a potential

claim as of June 6, 2019, such claim matured into a lawsuit in December 2021, and Martin

Sports failed to produce documents requested by Local 11 from which damages could be calculated with specificity for the June 6 and 12, 2019 events. Pl.'s Opp'n 10–12 [Doc. No. 48].

"The theoretical underpinnings for the spoliation doctrine are solid. 'We have held with some regularity that a trier of fact may (but need not) infer from a party's obliteration of [evidence] relevant to a litigated issue that the contents of the [evidence] were unfavorable to that party.'" Gomez v. Stop & Shop Supermarket Co., 670 F.3d 395, 399 (1st Cir. 2012) (quoting Testa v. Wal–Mart Stores, Inc., 144 F.3d 173, 177 (1st Cir. 1998)). "But cases are not decided on theory alone. Before an inference of spoliation may be drawn, its proponent must show at a bare minimum that the opposing party had notice of a potential claim and of the relevance to that claim of the destroyed evidence." Id. (citing Blinzler v. Marriott Int'l, Inc., 81 F.3d 1148, 1158–59 (1st Cir. 1996)). "And there is an even more rudimentary requirement: the party urging that spoliation has occurred must show that there is evidence that has been spoiled (i.e., destroyed or not preserved)." Id.

Local 11 contends that spoliation occurred because Martin Sports "had notice of a potential claim as of June 6, 2019[,]" and "would have had payroll and other records of the type requested by Local 11." Pl.s' Opp'n 11 [Doc. No. 48]. Martin Sports does not deny that notice, but counters that there is "no evidence that Martin Sports destroyed any evidence within its custody or control pertaining to Local 11's claims." Def.'s Reply Brief in Supp. of Mot. for Summ. J. ("Def.'s Reply") 4 [Doc. No. 51]. According to Martin Sports, "Local 11's counsel chose not to take the deposition of [David] Martin and to query him about the Martin Sports events produced on June 6 and 12[,] and October 12 and 14, 2019 . . . . [and] did not further correspond with counsel for Defendant or file a motion to compel with respect to any claim that

Defendant's objections to any of Local 11's discovery requests were unsustainable and/or that its responses were incomplete." Id.

With respect to the Bruins Fan Fests produced by Martin Sports on June 6 and 12, 2019, Local 11 requested the following: "[a]ll documents concerning the identity of individuals who performed work of the type performed by [Local 11] referrals during the Boston Bruins Fan Fests produced by Defendants on May 9, 12, 27 and 29, 2019, including the day and hours worked by each individual, the type of services provided by each individual and the compensation received by each individual." Pl.'s First Req. for Product of Docs, Req. 1 [Doc. No. 48-2]. Martin Sports responded that it "is searching for any responsive documents." Id. While the court agrees that Martin Sports did not state that it did not have the documents, its response then and in briefing here provide sufficient evidence that Martin Sports produced Fan Fests on June 6 and 12, 2019, and work of the type previously performed by Local 11 referrals was also performed for those events. Accordingly, Local 11 has evidence of damages. A reasonable fact finder could infer that work that fell under the purview of the 2019 Agreement was necessarily completed in facilitation of the June Fan Fest events at issue.

To the extent that Martin Sports seeks judgment on the ground that Local 11 cannot prove those damages with specificity, such a finding on summary judgment would improperly reward Martin Sports's failure to comply with its discovery obligations. Accordingly, where at least some damages may be inferred, the court will deny summary judgment and leave the specific amount of damages to be determined at trial, where Local 11 can subpoena David Martin and the records at issue to prove the specific amount of damages.

Accordingly, Martin Sports's <u>Motion for Summary Judgment</u> [Doc. No. 46] is denied as to the June 6 and June 12, 2019 events.

B.  *October 12 and 14, 2019*

Martin Sports raises the same arguments (other than statute of limitations) regarding the October 2019 events. Here, the record supports summary judgment.

Glynn states in her affidavit that "consistent with [her] discussions with [Theresa] Martin, the [2019] [A]greement was to apply to the Fan Fests to be produced by Martin Sports during 2019, including the Fan Fests scheduled for . . . October 12 and 14, 2019." Glynn Aff. ¶ 7 [Doc. No. 48-1]. However, "the non-moving party's burden cannot be satisfied with a declaration that 'without proper explanation' contradicts his/her prior deposition testimony." Meuser v. Fed. Express Corp., 564 F.3d 507, 515 (1st Cir. 2009); see also Abreu–Guzman v. Ford, 241 F.3d 69, 74 (1st Cir. 2001) ("[A] party opposing summary judgment may not manufacture a dispute of fact by contradicting his earlier sworn testimony"). Glynn's prior deposition testimony was that the contract term was left blank because the events were tied to the Bruins being in the playoffs and the agreement was intended to cover events through the Stanley Cup Final. See Glynn Dep. Tr. 64:15–22 [Doc. No. 46-4]. The October dates, however, were not tied to the playoffs or the Stanley Cup Final but were part of the next season.

And if the contract did not have a termination date, then the June notice of termination was sufficient to ensure that the contract had ended by the October dates.

Accordingly, summary judgment is granted as to Martin Sports as to the October 2019 events.[3]

---

[3] Martin Sports also argues that Local 11 does not have probative evidence of damages as to the October 12 and 14, 2019 Fan Fest events. The court need not address this argument where the court has found that those events were not subject to the 2019 Agreement.

**IV.     Conclusion**

For the forgoing reasons, Martin Sports's <u>Motion for Summary Judgment</u> [Doc. No. 46], is GRANTED as to the claims relating to the October 2019 Bruins Fan Fest events and otherwise DENIED.

IT IS SO ORDERED.

Dated: March 22, 2023                          /s/ Indira Talwani
                                                       United States District Judge